United States District Court
Southern District of Texas

**ENTERED**

November 12, 2021
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT                    SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| Mexichem Amanco Holding, | § | |
| S.A. de C.V., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action H-20-1960 |
| | § | |
| The Chemours Company and | § | |
| The Chemours Company, FC, LLC, | § | |
| Defendants. | § | |

# Report and Recommendation

Mexichem Amanco Holding, S.A. de C.V., (Mexichem) filed this lawsuit against The Chemours Company, alleging infringement of U.S. Patent No. 8,633,340 ('340 Patent).[1] (D.E. 1, D.E. 33-1.) Mexichem filed an amended complaint with leave of court, adding The Chemours Company, FC, LLC, (Chemours II) as a defendant.[2] (D.E. 23, D.E. 33.) A claim construction (*Markman*[3]) hearing was held on June 10, 2021. (D.E. 123.) The court recommends these constructions of the disputed terms.

## 1. Background

The '340 Patent, titled "Process for the Production of Chlorinated and Fluorinated Alkanes and Alkenes in the Presence of a Catalyst[,]" has been assigned to Mexichem. The '340 Patent describes a process for preparing a chemical referred to as "243db" by contacting another chemical referred to as "1243zf" with chlorine in the presence of certain catalysts. 243db is itself a precursor chemical

---

[1] Where citing to the specification and claims of the '340 Patent, the court uses the format (column:lines.) without naming the patent each time.
[2] The Chemours Company and The Chemours Company, FC, LLC, are referred to collectively in the singular as "Chemours."
[3] *Markman v. Westview Instruments*, 517 U.S. 370, 372 (1996).

used in the manufacture of a refrigerant referred to as "1234yf"—the product that is actually sold to consumers. Thus, the patented invention relates to preparing the precursor chemical—243db. According to the abstract of the '340 Patent, "[t]he invention provides a process for preparing 1,1,1-trifluoro-2,3-dichloropropane (243db), which process comprises contacting 3,3,3-trifluoropropene (1243zf) with chlorine in the presence of a catalyst, wherein the catalyst comprises activated carbon, alumina and/or an oxide of a transition metal." The specification explains that the process disclosed in the '340 Patent "provides a surprisingly clean and efficient means for preparing 1,1,1-trifluoro-2,3-dichloropropane from 3,3,3-trifluoropropene." (1:18–20.) More specifically, the '340 Patent discloses that, by using one of the three identified types of catalysts, "lower temperatures can be used compared to without the use of such a catalyst. . . . [which] is believed to result in less by-products and [to] increase yield of 1,1,1-trifluoro-2,3,-dichloropropane." (1:20–25.)

On January 21, 2014, the U.S. Patent Office issued the '340 Patent. "On November 25, 2014, Chemours II's predecessor in interest filed for a reissue patent application to amend the claims of U.S. Patent No. 8,318,992" (the Rao Patent). (D.E. 33 ¶ 8.) On September 14, 2015, the Rao Patent was assigned to Chemours II. *Id.* On May 10, 2018, in connection with the reissue application, Chemours filed a suggestion of interference between the reissue application and the '340 Patent. (D.E. 86-1 at 20–21, 24.)

John W. Smith, one of the inventors of the '340 Patent, filed several motions for judgment in the interference proceeding arguing that the invention claimed in the Rao Patent was not patentable. (D.E. 80-4 at 206-07.) On November 26, 2019, the Patent Trial and Appeal Board (PTAB) granted one of Smith's motions on the ground that the Rao Patent failed to comply with the written description requirement of the Patent Act. *Id.* at 205–07, 220. On January 12, 2021, the Federal Circuit affirmed the PTAB's decision. *Id.* at 222–23. Chemours II later filed a petition seeking *inter partes* review of Claims 1–14 and 28–56 of the '340 Patent. *Id.* at 226. On March 25, 2021, the PTAB denied institution of the *inter partes* review because Chemours

II could have raised the patentability challenges in the interference proceeding. *Id.* at 225–26, 237–38.

## 2. *Legal Standard for Claim Construction*

"The purpose of claim construction is to 'determin[e] the meaning and scope of the patent claims asserted to be infringed.'" *Lemoine v. Mossberg Corp.*, 2020-2140, 2021 WL 4199934, at *2 (Fed. Cir. Sept. 15, 2021) (alteration in original) (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995)). In construing patent claims, context is important. *See, e.g., Lemoine*, 2021 WL 4199934, at *2 (finding that the preamble of the patent provided "important context for the nature and structure of the invention being claimed" without which it was "difficult to make sense of the claims"); *Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1374 (Fed. Cir. 2004) (explaining that differences in the context of the usage of two terms supported a finding that they were synonymous); *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1347–48 (Fed. Cir. 2009) (relying on "the context in which the term was used within the claim and the specification" to determine the "proper construction").

Claim construction is an issue of law to the extent that it is decided on the intrinsic evidence. *Data Engine Techs. LLC v. Google LLC*, 10 F.4th 1375, 1380 (Fed. Cir. 2021) (quoting *Arctic Cat Inc. v. GEP Power Prods., Inc.*, 919 F.3d 1320, 1327–28 (Fed. Cir. 2019)); *see also Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 326 (2015) (stating that "the ultimate issue of the proper construction of a claim should be treated as a question of law"). Unless the inventor acts as a lexicographer and defines claim terms in a special way, "[t]he words of a claim are generally given their ordinary meaning, which is 'the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention.'" *Data Engine Techs. LLC*, 10 F.4th at 1381–82 (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc)); *see also Phillips*, 415 F.3d at 1316 (allowing inventors to give claim terms special meanings). For purposes of claim construction, "a person of ordinary skill in the art is deemed to read the claim term not only in the context of a particular

claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313.

The claims are the portion of the patent that define "the scope of the patentee's rights." *Teva Pharms. USA, Inc.*, 574 U.S. at 321. The court must read the claims, however, in light of the specification and the prosecution history if in evidence. *Data Engine Techs. LLC*, 10 F.4th at 1382 (quoting *Phillips*, 415 F.3d at 1315, 1317 (referring to the patent as "a fully integrated written instrument" consisting of a specification that concludes with the patent claims)). "Typically, the specification is the best guide for construing the claims." *Lemoine*, 2021 WL 4199934, at *2 (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.")).

A court also may rely on extrinsic evidence, which includes dictionaries and expert testimony. *Phillips*, 415 F.3d at 1317. Technical dictionaries can be useful in claim construction, particularly in assisting the court to understand the meaning of terminology to persons of ordinary skill in the art. *Id.* at 1318. "Yet heavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is in the specification." *Id.* at 1321.

> "[E]xpert testimony can be useful to a court for a variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field."

*Phillips*, 415 F.3d at 1318. To the extent, however, that the expert testimony is conclusory, unsupported, and "clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history," it should be discounted. *Id.*

4

(quoting *Key Pharms. v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998)). Claim construction may require that the district court "make 'credibility judgments' about witnesses." *Teva Pharms. USA, Inc.*, 574 U.S. at 327.

### 3. *Claim Construction*

The parties dispute the meaning of these claim terms: (1) "catalyst;" (2) "a catalyst (e.g. a zinc/chromia catalyst);" (3) "oxide of a transition metal;" (4) "the [a] catalyst comprises[ing] activated carbon, alumina, and/or an oxide of a transition metal;" and (5) "purified." In construing these claim terms and phrases, the court has focused first and foremost on the claim language and the specification's description. The court has also consulted technical dictionaries and considered the expert testimony to determine the meaning of the claim language to one of ordinary skill in the art at the time of the invention.[4] The court finds that portions of both experts' testimony are at odds with the intrinsic evidence. The court has specifically identified when it has relied on or rejected expert testimony. *See Phillips*, 415 F.3d at 1318 (stating that "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence").

### A. *"catalyst"*

Mexichem argues that no construction is necessary for the term "catalyst" because the plain and ordinary meaning applies but, should the court determine that construction is necessary, the construction should be a "substance that increases reaction rate, yield, or selectivity[.]" (D.E. 69-1 at 3.) Chemours argues that the construction should be a "substance that increases the rate of a chemical reaction without being appreciably consumed and that can be reused[.]" *Id.* at 6.

---

[4] The parties agree that a person of ordinary skill in the art in the context of this case has a Ph.D. in chemistry with three years of experience. D.E. 123 at 13.

The term "catalyst" appears no fewer than 200 times in the '340 Patent. The inventors did not offer any special definition for the term. (D.E. 80 at 22 (conceding that "no special meaning has been assigned to 'catalyst' in the Patent")). Although a "catalyst comprising activated carbon, alumina and/or an oxide of a transition metal" is the most often mentioned choice of catalyst throughout the specification and is the focus of the claimed invention, other catalysts are disclosed for use in various steps of the process. *See* (1:16–17; 3:6–8; 5:38–40; 10:61–62; 15:51–52; 25:39–40, 50–51, 58–59, 64–65; 26:31–32, 43–45, 48, 61–62; 27:20–21, 27–30, 36–38, 51–54; 28:41–42; 29:2–3.) The specification does not define the term or limit it in any way. It gives a wide-ranging list of examples of useful catalysts for different steps in the process. The court therefore looks to the claims and specification and, to the extent it does not conflict with those, the extrinsic evidence to construe the term.

The parties agree that a catalyst is a substance, as opposed to heat, light, or some other form of energy. Other than that, despite both sides taking the position that the definition of "catalyst" is readily understood by those of ordinary skill,[5] the parties disagree about everything else that characterizes a catalyst. Chemours argues that a catalyst must increase the rate of a reaction, while Mexichem argues that a catalyst may merely increase yield[6] or selectivity[7] without affecting the rate of the reaction. Chemours argues that a catalyst must be reusable, while Mexichem maintains that reuse is optional. Finally, Chemours argues that a catalyst must not be appreciably consumed, while Mexichem argues that some of the catalysts

---

[5] The court notes that, according to *Advanced Inorganic Chemistry,* an excerpt of which Mexichem submitted with its briefing, "[t]he term 'catalyst' is often ambiguous and not clearly defined." F. Albert Cotton, et al., *Advanced Inorganic Chemistry* 1167 (6th ed. 1999); *see also* (D.E. 80-3 at 232.)

[6] Yield refers to the overall output of the product of a chemical reaction. *Cf.* (D.E. 80-1 at 41.)

[7] Increasing the selectivity of the reaction means increasing the production of the desired chemicals, while decreasing the production of by-products and waste. *Cf.* (D.E. 80-1 at 41.) It is a stated goal of the '340 Patent to increase selectivity by lowering the reaction temperature. *See* (1:20–25.)

disclosed in the '340 Patent must be regenerated after some use and are therefore "consumed" with use.

There is consensus among science and technical dictionaries that, in general, a "catalyst" is a substance (not light, heat, radiation, etc.) that increases the rate of a reaction and is not appreciably consumed. *See, e.g., McGraw-Hill Concise Encyclopedia of Science and Technology* 378 (5th ed. 2005) (defining the term "catalysis" as "[t]he phenomenon in which a relatively small amount of foreign material, called a catalyst, augments the rate of a chemical reaction without itself being consumed. A catalyst is material, and not light or heat. It increases a reaction rate."); *see also* (D.E. 80-3 at 195.)

The court first addresses the debate about rate versus yield versus selectivity. Sources that describe catalysts in greater technical detail and that address the science of how a catalyst works at the atomic and molecular level give the term greater meaning than can be found in the generic dictionaries cited above. *Heterogeneous Catalysis in Industrial Practice* explains that "[t]he activity of a catalyst refers to the rate at which it causes the reaction to proceed to chemical equilibrium." Charles N. Satterfield, *Heterogeneous Catalysis in Industrial Practice* 9 (2d ed. reprint 1996) (emphasis omitted); *see also* (D.E. 80-3 at 254.). "The rate of the reaction depends on pressure, temperature, concentration of reactants and products, and other variables." Satterfield at 10; *see also* (D.E. 80-3 at 255). Thus, according to that source, one way of describing the activity of a catalyst is "as the temperature required for a given conversion at a fixed feed composition and pressure." Satterfield at 10; *see also* (D.E. 80-3 at 255.) Another source submitted with Mexichem's briefing explains that "[a] material that lowers the activation energy is called a catalyst."  (D.E. 80-3 at 259.) The same source goes on to explain that a catalyst "merely speeds up the reaction by providing a lower energy path between reactants and products." *Id.* at 260. The takeaway from these extrinsic sources is that a catalyst increases the reaction rate at a given temperature.

The specification uses the term "catalyst" in the same sense to refer to the rate of reaction at a given temperature. Or, stated another way, the specification recognizes that a catalyst allows a reaction to

proceed at a lower temperature than without it. For example, the specification discloses that, by using a catalyst, "lower temperatures can be used compared to without the use of such a catalyst[,]" which the specification discloses is "believed to result in less by-products and [to] increase yield of 1,1,1-trifluoro-2,3,-dichloropropane." (1:20–25.) The specification also discloses that "[t]he temperature may vary depending on the nature of the catalyst employed" and that the use of zinc/chromia catalysts require fewer forcing conditions, such as temperature and pressure, than otherwise would be required." (4:60–61; 19:50–54.) Dr. Joseph Thrasher explained it this way at the *Markman* hearing: "[B]y being able to go at a lower temperature and still do the chemistry you want, that's indirectly saying that the rate is increased because - - and then you hope that the rate is increased or would have been increased at this temperature more for the product you want than for the side products you do not want." (D.E. 123 at 289.)

Mexichem points out the statement in the specification that "[t]he zinc/chromia catalysts of the invention typically have an advantageous balance of levels of activity and selectivity" to argue that a catalyst need not speed the rate of reaction but may instead only increase the yield and/or selectivity. (7:12–14.) That statement is not inconsistent with the court's understanding of the term because, by speeding the reaction at a given temperature, a catalyst allows the temperature of the reaction to be decreased, thus producing less waste and more of the desired product. In other words, the reaction rate at a given temperature is increased, and *as a result* yield and selectivity may be influenced.

The court concludes that a "catalyst," as that term is used in the '340 Patent, refers to a substance that increases the reaction rate at a given temperature.

The court addresses next the debate about whether a catalyst is "consumed" in the reaction. Sources cited with the parties' briefing explain that, while the catalyst may take part in the reaction, for example by sharing electrons or other atoms with the reactants, when the reaction is complete, that which the catalyst contributed to the reaction is returned to the catalyst.

8

An excerpt from *Comprehensive Chemical Kinetics* states in connection with a catalytic cycle, for example, that "[i]n catalysis, the catalyst is first consumed and then reconstituted in a later step." *Comprehensive Chemical Kinetics*, vol. 40 at 8 (N.J.B. Green ed., 2d ed. 2004); *see also* (D.E. 80-3 at 238.) In connection with heterogeneous catalysis, *Heterogeneous Catalysis in Industrial Practice* states "[a] catalyst is a substance that increases the rate of reaction toward equilibrium without being appreciably consumed in the process." Satterfield at 8; *see also* (D.E. 80-3 at 253.) The same source goes on to explain, however, that a catalytic reaction "involves a cyclic process in which a site on a catalyst forms a complex with reactants, from which products are desorbed, thereby restoring the original site and continuing the cycle." Satterfield at 8; *see also* (D.E. 80-3 at 253.) It goes on to clarify that "[t]his concept may lead to the idea that a catalyst is unaltered by the reaction it catalyzes, but this is misleading. A catalyst may undergo major changes in its structure and composition as a result of the mechanism of its participation in the reaction." Satterfield at 8; *see also* (D.E. 80-3 at 253.) Finally, the same source explains that if a chemical is completely consumed into a chemical reaction, it cannot be regarded as a catalyst. Satterfield at 9; *see also* (D.E. 80-3 at 254.)

Dr. Thrasher testified that "at the microscopic level, the catalyst is getting involved in the chemistry, but you get it back for another cycle and another cycle and another cycle until perhaps it's deactivated by some side reaction or decomposition, which is not the chemical reaction you're interested in . . . . So that unwanted side reaction[] and decomposition are not consumption in the desired chemical reaction." (D.E. 123 at 292.)

The court understands these extrinsic sources to mean that, while the catalyst takes part in the reaction, it is not a reactant and is not consumed *into* the reaction.

Intrinsic evidence is consistent with the cited extrinsic evidence. The specification teaches in every embodiment described that at least one step of the claimed process occurs "in the presence of a catalyst[.]" *See, e.g.*, (1:13–14; 3:4–5; 10:60–62.) Every independent claim also uses the phrase "in the presence of a catalyst." (25:38–39,

9

49–50, 57; 26:43, 27:20, 36; 28:22.) In the context of the specification and claims, "in the presence" means that the catalyst is physically in contact with the reactants but is not itself a reactant. *See also, e.g.*, *ASTM Dictionary of Engineering Science & Technology*, 88–89 (Susan A. Arendt, et al., eds., 10th ed. 2005) ("[A] substance whose presence initiates or changes the rate of a chemical reaction[] but does not itself enter into the reaction."); *see also* (D.E. 80-3 at 265–66.)

Relatedly, the parties disagree about whether the substance must be reusable to qualify as a catalyst. The specification discloses that catalysts may be regenerated or reactivated periodically. (9:37–45.) The parties agree that catalysts may be altered in a reaction such that they can no longer act as catalysts and must be regenerated before reuse. A person of ordinary skill in the art would understand this to be consistent with how catalysts work and are affected by the reaction they facilitate. Although regeneration and reactivation for reuse are mentioned in the specification, the court concludes that reusability is not important to the claimed invention and is merely an optional aspect of a catalyst. The inventors did not limit their invention to catalysts that must be reusable. *See Lemoine*, 2021 WL 4199934, at *3; *cf. Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1359 (Fed. Cir. 2003) (finding that, absent language of surrender, the specification did not indicate that the patentee was no longer claiming an element not included in a patent figure).

The disclosed characteristics of catalysts discussed above have long been understood to persons with ordinary skill in the art. *See, e.g.*, Robert C. Weast, et al., *CRC Handbook of Chemistry and Physics* F-71 (67th ed. 1986) (defining "catalytic agent" as "[a] substance which by its mere presence alters the velocity of a reaction[] and may be recovered unaltered in nature or amount at the end of the reaction"). And, although arguably taken out of context, Mexichem has made statements that confirm the court's construction of the term. *See, e.g.*, (D.E. 86-1 at 34–35; D.E. 86-1 at 54) (stating in the context of an interference proceeding involving the '340 Patent that "[a] catalyst is another material that is added to a reaction system to facilitate or drive a chemical reaction. It interacts with the reactants

to promote, possibly many reactions at the atomic or molecular level, and enhance the rate of reaction[,] but it is not itself consumed").

The court recommends that the proper construction of the term "catalyst" is "a substance that increases the rate of reaction at a given temperature but is not itself a reactant."

### B. "a catalyst (e.g. a zinc/chromia catalyst)"

Mexichem argues that no construction is necessary for the phrase "a catalyst (e.g. a zinc/chromia catalyst)" because the plain and ordinary meaning applies but, should the court determine that construction is necessary, the construction should be "a catalyst, for example a zinc/chromia catalyst[.]" (D.E. 69-1 at 4.) Chemours argues that the phrase is indefinite. *Id.* at 6.

Patent claims are indefinite if, when read in light of the intrinsic evidence, "they do not 'inform those skilled in the art about the scope of the invention with reasonable certainty.'" *Horizon Pharma, Inc. v. Dr. Reddy's Lab'ys Inc., 839 F. App'x 500, 505 (Fed. Cir. 2021) (quoting Nautilus, Inc. v. Biosig Instruments,* Inc., 572 U.S. 898, 910 (2014). "The definiteness requirement . . . mandates clarity, while recognizing that absolute precision is unattainable." *Nautilus,* 572 U.S. at 910. Because "[a] lack of definiteness renders invalid 'the patent or any claim in suit[,]'" the burden of proof is by clear and convincing evidence. *Nautilus, Inc.,* 572 U.S. at 902; *Biosig Instruments, Inc. v. Nautilus, Inc.,* 783 F.3d 1374, 1377 (Fed. Cir. 2015).

Chemours argues that the use of "e.g." in Claim 12 is "problematic" because a person of ordinary skill in the art "would not be able to determine from the claim language whether it encompasses all catalysts . . ., only a zinc/chromia catalyst, zinc/chromia catalysts and similar catalysts, or something else altogether." (D.E. 81 at 48.) According to Chemours, because the word catalyst is sometimes used by itself in the claims, as in Claim 6, while other times the claims recite specific catalysts, Claim 12's use of "e.g. a zinc/chromia catalyst" renders it unintelligible. The court disagrees.

Claim 12 is dependent on Claim 11, which is dependent on Claim 4. Claim 4 describes a two-step process with the first step being

conversion of 250fb to 1243zf (with no mention of a catalyst) and the second step being contacting the 1243zf with chlorine in the presence of one of the three catalysts of the invention. Claim 11 adds to the first step of Claim 4 a fluorination and dehydrohalogenation step, and Claim 12 recites performing that first step in the presence of a "catalyst (e.g. a zinc/chromia catalyst)." The specification describes exactly this process and explains that any suitable catalyst may be used in this step, including the zinc/chromia catalysts discussed throughout the specification. (4:8-17.)

Thus, in context, the phrase "a catalyst (e.g. a zinc/chromia catalyst)" is easily understood. It is nothing more than a "catalyst" that has been defined above and may include a zinc/chromia catalyst. The court finds that Chemours has failed to show, by clear and convincing evidence, that Claim 12 is indefinite.

### C. *"an oxide of a transition metal"*

Mexichem argues that no construction is necessary for the phrase "an oxide of a transition metal" because the plain and ordinary meaning applies but, should the court determine that construction is necessary, the construction should be "a compound that includes, but is not limited to, one or more oxygen atoms, where at least one oxygen atom is directly bonded to one or more transition metal atoms only[.]" (D.E. 69-1 at 2.) Chemours agrees that the plain and ordinary meaning should apply but offers a very different definition: "a compound that includes one or more oxygen atoms, where all the oxygen atoms are directly bonded to transition metal atoms only[.]" *Id.* at 5.

The parties and their experts agree that an oxide, under a strict scientific definition, is a single oxygen molecule with a -2 charge, which when bonded to something else is referred to as an oxide of that something else. They also agree that a hydroxide is a single oxygen molecule bonded to a single hydrogen molecule that together have a -1 charge, which when bonded to something else becomes a hydroxide of that something else. For example, $Fe_2O_3$ is iron oxide, and $Fe(OH)_3$ is iron hydroxide. The disagreement is whether something that has both an oxide and a hydroxide, such as $FeO(OH)$, which strictly

speaking is iron oxide-hydroxide, is an oxide of iron. Mexichem says it is; Chemours says it is not.

Chemours' definition would exclude from the definition of "oxide of a transition metal" all compounds containing a hydroxide group because at least one oxygen would be bonded to a hydrogen, which is not a transition metal. On the other hand, Mexichem's definition would include within the meaning of "oxide of a transition metal" all compounds containing at least one oxygen bonded to and only to a transition metal, regardless of whether the transition metal is also bonded to something else, such as a hydroxide group.

The disagreement relates to whether persons of ordinary skill would use the word "oxide" loosely to refer to anything with an oxide group, or whether they would confine "oxide" to only those substances lacking a hydroxide group.[8]

The experts testified at length about chemical nomenclature, which is a very specific set of rules used by chemists to convey information about the composition and structure of a molecule using words instead of symbols or drawings. Under those rules, $FeO(OH)$, for example, is both an oxide and a hydroxide and thus is an oxide-hydroxide because it has a single oxygen bonded to one side of the transition metal and the OH group bonded to the other side (graphically, OH–Fe=O). The experts agree on this point. (D.E. 123 at 90, 216.) Mexichem argues that, under the nomenclature rules, $FeO(OH)$ is an oxide, and Chemours says it is not. None of the materials cited make clear who is correct.

On the other hand, both parties' experts also agree that an oxide-hydroxide might be referred to, in a more general sense, as an oxide by a person of ordinary skill in the art. Dr. Robert Syvret testified that $FeO(OH)$ is "an oxide by virtue of the fact that it contains an oxygen bonded only to the iron o2 minus." (D.E. 123 at 90.) Dr. Thrasher testified that, in the chemical literature, iron oxide-

---

[8] To foreshadow, Chemours does not seek to exclude from the definition of the phrase "oxide of a transition metal" those molecules having groups other than hydroxides attached also to the transition metal.

13

hydroxide is sometimes referred to by the "collect-all or family-like name" of oxide compound. (D.E. 123 at 209, 216.) The question for the court to resolve is the way in which the term "oxide" is used in the claims of the '340 Patent—strictly under the nomenclature rules or more loosely as a collect-all term.

With the exception of Claims 29 and 34, every time the phrase "oxide of a transition metal" is used in a claim, it is one of the three types of catalysts identified for use in the claimed invention. (25:39–40, 50–51, 57–59; 26:43–45; 27:19–20, 36–38, 60–62; 28:22–24.) The other two are activated carbon and alumina. *Id*. The specification discloses that activated carbon "includes any carbon with a relatively high surface area" and may be derived from charcoal, nutshells, or wood. (1:40–46.) The specification thus indicates that the term "activated carbon" does not convey a particular chemical or molecular micro-structure but instead describes the way the material has been processed such that it has a large surface area to promote the chemical reaction. Alumina, on the other hand, is not defined in the specification. PubChem, a resource of the National Library of Medicine, defines the term "alumina" to refer to the specific compound $Al_2O_3$, which is aluminum oxide. PubChem, pubchem.ncbi.nlm.nih.gov/compound/Alumina (last visited Oct. 29, 2021). Thus, one of the two other catalysts mentioned with "oxide of a transition metal" is described generally to convey surface characteristics, while the other is named in quite a specific way to convey its chemical structure.

Elsewhere in the specification, specific oxides of transition metals are identified using their specific chemical names and are identified using symbols, including chromia, $Cr_2O_3$, and zinc oxide, $ZnO$. (1:61; 2:38.)

In other places, the specification uses the term "oxide" in a more general sense. For example, when discussing a preferred oxide of a transition metal, the specification discloses chromia alone or modified by the addition of another metal ("Zn, Mn, Zr, Ni, Al and/or Mg and/or a compound of one or more of these metals"), which the specification refers to as a "chromia-based" catalyst. (1:61–63.) Thus a "chromia-based catalyst" *is* an oxide of a transition metal in the

14

context of the '340 Patent. The specification further discloses "a zinc/chromia catalyst" to be a preferred chromia-based catalyst. (1:66–67; 5:51–55, 57–58.) Therefore, a "zinc/chromia catalyst" *is* a "chromia-based catalyst," which *is* an oxide of a transition metal as that term is used in the '340 Patent.

The specification then discloses that "[t]ypically, the chromium or compound of chromium present in the zinc/chromia catalysts of the invention is an oxide, oxyfluoride or fluoride of chromium such as chromium oxide." (6:3–6.) In another reference to the zinc/chromia catalyst, the specification discloses that the zinc/chromia catalyst "is believed . . . [to have] a surface containing cations of zinc located in a chromium-containing lattice, for example chromium oxide, oxyhalide, or halide lattice." (8:1–9.) The inventors thus included within the meaning of oxide of chromium chromium oxide, chromium oxyfluoride, and chromium oxyhalide. As shown, the context of the entire specification supports the conclusion that the inventors intended to broadly define the term "oxide." The inventors did not limit the meaning of the phrase "oxide of a transition metal" by use of strict principles of chemical nomenclature.

Chemours argues that, because the inventors did not disclose any oxide-hydroxide molecules, they are excluded from the definition of the phrase "oxide of a transition metal." Reaching that conclusion would be, in the court's view, inconsistent with the law. As explained above, the inventors used the term "oxide" in a general sense throughout the specification. When they intended to convey a specific chemical structure or composition, they did so. *See, e.g.,* (12:44–59, 13:28–32.) The claims and specification[9] do not contain any language surrendering the inclusion of oxide-hydroxide from the definition of an oxide of a transition metal. *See Cordis Corp., Inc.,* 339 F.3d at 1359 (finding no language of surrender where the language was "amenable to multiple reasonable interpretations"). An inventor "is not required

---

[9] The parties' exhibits include filings and decisions from the interference proceeding, but neither side cited anything from the prosecution history of the '340 Patent.

to describe in the specification every conceivable and possible future embodiment of [the] invention" and may provide "a written description of a broadly claimed invention without describing all species that [the] claim encompasses." *Id.* at 1365. The court thus concludes that oxide-hydroxides fall within the definition of the phrase "oxide of a transition metal," just as do the oxyhalides and oxyfluorides of a transition metal. All that is needed to constitute an "oxide of a transition metal" in the context of this patent is at least one oxygen atom bonded to and only to one or more transition metal atoms. It does not matter if the transition metal is also bonded to something else, including a hydroxide.

As the court mentioned in footnote 8 above, Chemours agrees that all manner of molecules having an oxide group attached to one side of the transition metal and other groups, such as fluorides, chlorides, and halides, attached to the other side of the transition metal would constitute "oxides," even under the strict rules of chemical nomenclature, but seeks to exclude any molecule having a hydroxide. Chemours gives no reasoned basis for excluding only oxide hydroxides, other than that it would not fit their definition otherwise. (D.E. 123 at 164, 173.) The court finds the argument unpersuasive and, respectfully, a bit circular and conclusory.

The court recommends that the proper construction of the phrase "oxide of a transition metal" is "a molecule containing at least one oxygen atom that is bonded only to a transition metal."

### D. *"the [a] catalyst comprises[ing] activated carbon, alumina, and/or an oxide of a transition metal"*

Mexichem argues that the construction should be:

> the [a] catalyst comprises[ing] activated carbon, alumina and/or an oxide of a transition metal, including catalysts that are essentially only activated carbon, alumina and/or an oxide of a transition metal and catalysts that are activated carbon, alumina and/or an oxide of a transition metal modified, for example, by the addition of one or more metals (e.g. transition metals) and/or compounds thereof.

(D.E. 69-1 at 2.) Chemours argues that the construction should be "the [a] catalyst comprises[ing] activated carbon, alumina and/or a compound that includes one or more oxygen atoms, where all the oxygen atoms are directly bonded to transition metal atoms only[.]" *Id.* at 5.

Claims 1, 4, 5, 31, and 45 disclose "the catalyst comprises activated carbon, alumina and/or an oxide of a transition metal." (25:39–40, 50–51, 58–59; 27:36–38; 28:22–24.) Claim 28 discloses the same feature with slight grammatical changes ("a catalyst comprising . . ."), which the parties do not suggest alters the meaning. (27:20–21.) The specification states:

> For the avoidance of doubt, by a catalyst which comprises activated carbon, alumina and/or an oxide of a transition metal, we include catalysts that are essentially only activated carbon, alumina and/or an oxide of a transition metal and catalysts that are activated carbon, alumina and/or an oxide of a transition metal modified, for example, by the addition of one or more metals (e.g. transition metals) and/or compounds thereof.

(1:32–39.) It helps to break this phrase down. It says that the catalysts of the invention include the recited three groups of catalysts by themselves or those same catalysts modified. It then gives examples of modifications.

The parties' proposed constructions do not reflect the real issue. Mexichem's proposed construction merely restates the claim language combined with additional language from the specification's "for the avoidance of doubt" paragraph, and Chemours' proposed construction restates the claim language but replaces "oxide of a transition metal" with Chemours proposed construction of that phrase. Chemours disregards the language from the "for the avoidance of doubt" paragraph while Mexichem just cuts and pastes the language into its proposed claim construction. The real issue in dispute is whether the "modified" language of the "for the avoidance of doubt" paragraph adds meaning to the claim language and, if so,

how the word "modified" affects the meaning of the phrase "oxide of a transition metal."[10]

Claims are to be read in the context of the written description in light of the specification. *Data Engine Techs. LLC*, 10 F.4th at 1382. In the "for the avoidance of doubt" paragraph, the inventors clarified that the catalysts used in Claims 1, 4, 5, 28, 31, and 45 included both catalysts that are "an oxide of a transition metal" and those catalysts "modified." It then gives examples of such modifications. Here, the inventors gave special meaning to the claim language, which the court must accept. *See Phillips*, 415 F.3d at 1316. Thus, the claims cover "an oxide of a transition metal modified." To ignore the inventors' intended meaning, as Chemours' definition does, would be to violate the rules of claim construction.

While Chemours ignores the word "modified," Mexichem reads far too much into it. According to Mexichem, the modification can be any modification with any resulting compound. Mexichem would include those things that the specification clearly contemplates, including adding something to the catalyst, or impregnating the catalyst with another material. But Mexichem goes one bridge too far. According to Mexichem, oxide of a transition metal modified can be any substance that could be made from an oxide of a transition metal, even if it is not an oxide of a transition metal and even if it was not actually made from an oxide of a transition metal to start with.

To elaborate, the parties and experts agree that, in a strict sense, oxides are not hydroxides, although, as discussed above, an oxide-hydroxide may sometimes be referred to as an oxide. But an oxide by itself is entirely different from a hydroxide by itself—as different as a fluoride is from an amide. Mexichem argues that one could take chromium oxide, $Cr_2O_3$, (indisputably an oxide) and chemically rearrange it into chromium hydroxide, $Cr(OH)_3$, (indisputably a hydroxide) by the addition of water, $H_2O$. Mexichem then argues that

---

[10] The parties do not argue and the court does not address how the word "modified" might affect activated carbon or alumina catalysts.

because one could make chromium hydroxide from chromium oxide, chromium hydroxide *is* chromium oxide modified. Therefore, according to Mexichem, chromium hydroxide (plainly not an oxide) is an oxide of chromium and thus is within the definition of "an oxide of a transition metal." Mexichem also argues that chromium hydroxide can come into being via a path that does not start with chromium oxide, but it is nevertheless an oxide of chromium modified, even though it is not an oxide of chromium and never was.

The court cannot read the claims the way Mexichem advocates. To do so would utterly rob the claim language of meaning. Every claim requires a catalyst that may include "an oxide of a transition metal," which must, regardless of how modified, still be an "oxide of a transition metal." *See Teva Pharms. USA, Inc.*, 574 U.S. at 321 (stating that the claims define the scope of patented rights).

This reading is consistent with the patent specification. "Modified" as used in the patent includes "impregnated." (1:48.) It also includes "by the addition of" another material. (1:52; 5:53.) Column 7 of the specification begins a discussion of certain ways to prepare the zinc/chromia catalysts of the invention. It discusses reduction of a chromium (VI) compound by a reaction with zinc to produce chromium (III) oxide and zinc oxide, two oxides of transition metals. (7:38–47.) The next paragraph discusses a method of introducing zinc to the chromia catalyst. (7:48–65.) The zinc is introduced as a halide, oxyhalide, oxide or hydroxide. If the zinc is to be impregnated into the chromia catalyst, the zinc would be in a water-soluble salt and would be introduced as a solution or slurry. Again, the zinc is modifying a material that is a chromia catalyst and thus is an oxide of a transition metal. A further method described starts with the hydroxides of zinc and chromium and uses a base to co-precipitate them and convert them to oxides. (7:56–60.) All three

methods describe ways of combining substances with the end product consisting of at least one oxide of a transition metal.[11]

The court recommends that the proper construction of the phrase "an oxide of a transition metal" includes "an oxide of a transition metal, as defined above, combined, either physically or chemically, with another substance."

### E. "purified"

Mexichem suggests that the court need not construe the term "purified" because there is not a dispute as to infringement based on the purification step of Claim 10. Although the court should not construe terms that are not in dispute, the court should construe the terms that are in controversy without reference to the accused device. *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999). The difference between Mexichem's and Chemours' proposed constructions reflects a controversy over the meaning and scope of the term "purified," which the court should resolve. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) (stating that claim construction resolves "disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement").

Mexichem argues that no construction is necessary for the term "purified" because the plain and ordinary meaning applies but, should the court determine that construction is necessary, the construction should be "separated from some amount of one or more other compounds[.]" (D.E. 69-1 at 4.) Chemours argues that the definition should be "separated from other products or reagent[s]." *Id.* at 6. A focus of the dispute over claim construction has been on the required percentage of purification, an issue not addressed in the claims or specification. Mexichem argues that removing a single molecule or

---

[11] Here, the court is not importing any limitations from the specification into the claims but is merely noting that the specification is consistent with the court's construction of the claims.

atom from a mixture produces a "purified" substance, while Chemours argues that every single foreign molecule or atom must be removed before the substance can be labeled "purified." It appears to the court that Mexichem's construction would capture every process where even an infinitesimal amount of one substance vaporizes from another, for example if the mixture is momentarily exposed to the air, while Chemours' construction would be practically impossible to achieve.

Claim 10, the only claim to use the term "purified," discloses "[a] process according to claim 5 wherein the 1,1,1,3-tetrachloropropane [(250fb)] is purified before conversion to 3,3,3-trifluoropropene (1243zf)." (26:4–6.) The '340 patent specification provides multiple examples of a purification step in which it uses the term "purified" to describe a process performed between steps in a reaction. (3:50–57; 5:20–26; 10:7–17; 17:53–61.)

One embodiment disclosed in the specification teaches a three-step process for preparing 243db.[12] (2:65–3:8.) In step (a) of that process, 1,1,1,3-tetrachloropropane (250fb) is produced by "telomerising ethylene and carbon tetrachloride[.]" (3:1–2.) The specification states that the 250fb is preferably "purified and/or isolated" before it is fluorinated in step (b) to form 1243zf. (3:53–55.) "This purification may conveniently be achieved, for example by distillation and/or extraction." (3:55–57; 5:24–26.) The specification thus discloses separating the 250fb from the reactants so that it can be fluorinated in the next step. Simply put, purification is a process of separating one substance from another so it can be used in the next step of the reaction.

In a preferred embodiment:

> the 243db formed by the processes described herein is fluorinated to produce a compound of

---

[12] The court notes a typographical error in the disclosure of this embodiment. The third step states that the final product is "1,1,1-trifluoro-2,3-dichloropropane (1243zf)." (3:5–6 (emphasis added).) That should read "1,1,1-trifluoro-2,3-dichloropropane (243db)." See (2:66–67 (emphasis added).)

> formula $CF_3CHFCH_2X$, wherein X is Cl or F. Thus,
> the invention provides a process for preparing a
> compound of formula $CF_3CHFCH_2X$, wherein X is
> CL or F, the process comprising (i) contacting
> 3,3,3-trifluoropropene (1243zf) with chlorine (Cl2)
> in the presence of a catalyst comprising activated
> carbon, alumina and/or an oxide of a transition
> metal to produce 1,1,1-trifluoro-2,3-
> dichloropropane (243db), and (ii) contacting the
> 243db with hydrogen fluoride (HF) in the presence
> of a fluorination catalyst to produce the compound
> of formula $CF_3CHFCH_2X$.

(5:32–43.) In this two-step embodiment, the first and second steps
may be carried out simultaneously or in sequence. (10:1–2, 7–8.) In
the latter case, "[t]he 243db formed in step (i) may be purified and/or
isolated prior to fluorination in step (ii), e.g. by removal and/or
recycling from the reaction vessel of *some or all* of the chlorine and/or
1243zf in step (i)." (10:9–12 (emphasis added).) "For example, the
243db may be separated (e.g. by distillation, condensation and phase
separation, and/or scrubbing with water or aqueous base) from the
chlorine and 1243zf in step (i) and transferred to a different reaction
vessel or zone for conducting the fluorination step (ii)." (10:12–17.)
Here, the chemical needed for step (ii) is 243db, and the goal of
purification is to separate it from the reactants before proceeding to
step (ii).

   In both examples, purification is optional. (3:53–54; 10:9.) In
the first, the specification discloses that purification is preferable, and,
in the second, the specification says that the 243db "*may* be purified."
Nothing in the specification or Claim 10 requires perfection in the
purification process or, on the other extreme, discloses that removal
of a single atom is sufficient. The experts' testimony in support of
these extreme positions is unpersuasive because it is not supported by
the written description. *See Phillips*, 415 F.3d at 1318 (stating that
expert testimony that is not supported by the written description
should be discounted). Rather, in context, separation only need be
within the bounds of what one would expect from typical methods
such as distillation, condensation, and phase separation and only

need be enough that the product can be used in the next step of the reaction.

The court recommends that the proper construction of the term "purified" is "a substance is purified when it is separated from one or more other substances such that it may be used in another step of the reaction."

### 4. Conclusion

These are the recommended constructions:

- "Catalyst" means a substance that increases the rate of reaction at a given temperature but is not itself a reactant.
- Claim 12 is not indefinite and does not require construction.
- An "oxide of a transition metal" means a molecule containing at least one oxygen atom that is bonded only to a transition metal.
- An "oxide of a transition metal" includes an oxide of a transition metal, as defined above, combined, either physically or chemically, with another substance.
- A substance is "purified" when it is separated from one or more other substances such that it may be used in another step of the reaction.

The parties have fourteen days from service of this Report and Recommendation to file written objections. 28 U.S.C. § 636(b)(1)(c); Fed. R. Civ. P. 72. Failure to timely file objections will preclude appellate review of factual findings or legal conclusions, except for plain error. *See Thomas v. Arn*, 474 U.S. 140, 147–49 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276–77 (5th Cir. 1988).

Signed at Houston, Texas, on November _12_, 2021.

Peter Bray
United States Magistrate Judge

23